

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **RAYMOND S. MINARDI** | § | |
| xxx-xx-8443 | § | Case No. 13-42770 |
| **and DEBBIE ANN MINARDI** | § | |
| xxx-xx-0264 | § | |
| | § | |
| Debtors | § | Chapter 7 |

| | | |
|---|---|---|
| MACK and ALICE WRIGHT | § | |
| | § | |
| Plaintiffs | § | |
| | § | |
| v. | § | Adversary No. 14-4008 |
| | § | |
| RAYMOND S. MINARDI | § | |
| | § | |
| Defendant | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Upon trial of the complaint filed by the Plaintiffs, Mack and Alice Wright (the "Plaintiffs") seeking a determination of whether a debt owed to them by the Debtor-Defendant, Raymond S. Minardi ("Minardi"), is dischargeable, the Court issues the following findings of fact and conclusions of law. The Plaintiffs contend that the debt is nondischargeable under the alternative grounds set forth in 11 U.S.C. §523(a)(2)(A), (a)(4), and (a)(19). After the trial, the Court took the matter under advisement. This decision disposes of all issues pending before the Court.

## FINDINGS OF FACT

1.    The Debtor-Defendant, Raymond S. Minardi, was a managing member of RMGT
      Investments II, LLC ("RMGT II"), a Delaware limited liability company, which
      served as the general partner of RSM Forex Fund LP II ("Forex Fund II").

2.    Forex Fund II was a Delaware limited partnership that was created to secure
      capital growth for its clients by engaging in the trading of foreign currency
      accounts through the use of an automated trading program known as "SAM, the
      trading robot."

3.    Investors were solicited by representatives of Forex Fund II and RMGT II to
      provide capital so that:  (1) Forex Fund II might meet required liquidity
      requirements to maintain its trading rights; and (2) such funds might actually be
      traded on foreign currency markets.

4.    Prior to the creation of Forex Fund II, Minardi had directed a virtually identical
      program while serving as a managing member of RMGT Investments, LLC, also a
      Delaware limited liability company, which served as the general partner of RSM
      Forex Fund, LP ("Forex Fund I"),  a Delaware limited partnership.

5.    Forex Fund I engaged in operations from the latter part of 2007 through the first
      two quarters of 2008.

6.    On June 5, 2008, the State of Texas filed a state court petition for restitution,
      receivership remedies, and the issuance of injunctive relief against Forex Fund I
      and all its principals, including Minardi, his business associate, Glenn A. Tucker,
      and all of the various RSM and RMGT entities, in the 416th Judicial District Court
      in and for Collin County, Texas under cause no. 416-01375-2008 ("the Forex I
      Litigation").[1]

7.    At the request of its Securities Commissioner, the State of Texas brought the Forex
      I Litigation against Minardi and his business entities/associates under allegations
      that they had collectively perpetrated a scheme to defraud the investing public
      regarding the purported success of the SAM automation program in procuring
      profits from foreign currency trading.[2]

---

[1] Plaintiffs' Ex. 3.

[2] *Id.*

8.    The 416th Judicial District Court granted a temporary restraining order that halted all business activities pertaining to Forex Fund I and the Defendants subsequently agreed to the appointment of a receiver over those business operations.

9.    On March 2, 2009, the 416th Judicial District Court entered, with the agreement of all defendants therein, an "Agreed Final Order of Permanent Injunction and Waiver of Interest" in the Forex I Litigation.[3]

10.    The agreed permanent injunction in the Forex I Litigation prohibited Minardi and the other named defendants, as well as the officers, agents, servants and employees thereof, from selling or offering to sell, in Texas, any security, unless such securities are exempted from registration by the Texas Security Act or a rule or regulation promulgated thereunder.[4]

11.    The permanent injunction further enjoined Minardi and his agents from:

[e]ngaging in fraud or fraudulent practices in connection with the offer for sale or the sale of securities in the State of Texas, including, but not limited to:
 (i) the making of any misrepresentation, in any manner, of a relevant fact;
(ii) the making of any promise of representation or prediction as to the future not made honestly and in good faith;
(iii) the intentional failure to disclose a material fact;
(iv) the gaining, directly or indirectly, through the sale of any security, of an underwriting or promotion fee or profit, selling or managing commission or profit, so gross or exorbitant as to be unconscionable;
(v) the making of an offer containing a statement that is materially misleading or is otherwise likely to deceive the public; and
(vi) materially aiding, with intent to deceive or defraud or with reckless disregard for the truth or the law, any person who in any way is participating in fraudulent practices.[5]

---

[3] Plaintiffs' Ex. 4.

[4] *Id*. at p. 3.

[5] *Id*.   The permanent injunction defined "security" in the broadest possible terms, including within its scope "any limited partner interest in a limited partnership," a "note...or other evidence of indebtedness," or "any form of commercial paper."  *Id*. at p. 4.

12.   The Agreed Final Order in the Forex I Litigation further resulted in the complete liquidation of Forex Fund I and the dissolution of that limited partnership, with limited partners allowed to exercise their redemption rights to obtain a pro-rata share of the Fund's assets, with the remaining funds utilized for payment of attorneys' fees.[6]

13.   Within only a few months after the entry of the Agreed Final Order in the Forex I Litigation, Minardi and his associates created the Forex Fund II limited partnership, its general partner, RMGT Investments II, LLC, and others.

14.   These new entities were virtually identical in form and function to those which had become defunct due to the entry of the permanent injunction.

15.   More importantly, the business activities which Minardi pursued through these new entities were materially the same business activities which had been enjoined in the Forex I Litigation.[7]

16.   One of the sales representatives for Forex Fund II and RMGT II in the West Texas area was Nyle Field.

17.   Field worked on a set salary and did not receive commissions based upon the solicited investments.

18.   Nyle Field was denominated by RMGT II as one of its members and a "senior trader."[8]

19.   In December 2009, Nyle Field solicited a Forex II Fund loan and/or investment from the Plaintiffs, Mack and Alice Wright, a retirement-aged couple from Levelland, Texas.

20.   Field had previously solicited and sold to the Plaintiffs in 2007 a third-party financial investment package with a fixed rate of return that had met the Plaintiffs' expectations.

---

[6]   *Id.* at pp. 7-8.

[7]   Plaintiffs' Ex. 17 [Deposition of Nyle Field] at 43:6-13; 43:21-44:2.

[8]   Plaintiffs' Ex. 11 at p. 12.

21.     Though intelligent people with significant savings, the Plaintiffs were not sophisticated investors.

22.     The Plaintiffs had never made individual purchases of any particular stock or bond, but had accumulated amounts in their respective 401k accounts.

23.     However, the solid performance of the 2007 financial investment, which the Plaintiffs had procured through Field, met the Plaintiffs' retirement goals of protecting the principal amount while gaining a higher interest rate than available through other sources.

24.     The success of their 2007 financial investment affirmed the Plaintiffs' belief that they could trust Nyle Field to help them achieve their conservative financial goals in their retirement years.

25.     Field made an oral presentation to both Plaintiffs about Forex Fund II and its intent to trade funds on foreign currency markets, utilizing the automated trading program involving "SAM, the trading robot."

26.     The Plaintiffs informed Field at that time that, similar to their 2007 investment, they were again interested only in a safe financial investment whereby their principal sums would be absolutely protected from loss, but from which they might derive an enhanced rate of return.[9]

27.     Field, on behalf of Forex Fund II and RMGT II, falsely represented to the Plaintiffs that they would receive a guaranteed 18% rate of return on their investment.[10]

28.     Field falsely represented to the Plaintiffs that Forex Fund II was engaged in active currency trading and was trading real investor dollars.

29.     Field did not inform the Plaintiffs that their money would be used in a non-active start-up venture which was not currently active in the trading of foreign currency because the Plaintiffs would not have been interested in such a speculative

---

[9]  Plaintiffs' Ex. 18 [Testimony of Nyle Field at Exemplary Damage Hearing before United States District Court for the Northern District of Texas, Lubbock Division] at 83:14-19.

[10]  Plaintiffs' Ex. 18, Tucker testimony at 83:20-23.

venture.[11]

30. Field instead falsely represented that Forex Fund II was engaged in active trading of foreign currencies and assured the Plaintiffs that any loan and/or investment which they would make in this venture was consistent with their stated goal of preserving their assets and foregoing any risk.

31. Field provided general information to the Plaintiffs about the Forex I Litigation but he represented to the Plaintiffs that all of the defendants in that litigation, including Minardi, had been cleared by state securities regulators.

32. The Plaintiffs were not informed that a receiver had been appointed for Forex Fund I in the Forex I Litigation in order to return funds to investors.

33. Nyle Field did not provide the Plaintiffs with any subscription booklet.

34. More significantly, Nyle Field did not provide the Plaintiffs with a copy of the Private Placement Memorandum pertaining to the Forex Fund II investment (the "PPM"), a 170-page document which would have disclosed the substantial risks which they were assuming by making this particular investment.[12]

35. Had the Plaintiffs actually had the opportunity to review the contents of the PPM, they would have learned, as disclosed on page 1 of that document, that "[T]he Partnership's investment practices, by their nature, involve a substantial degree of risk" and they would have been directed to review the specific PPM section entitled "Risk Factors."[13]

36. Had the PPM been provided to them, the Plaintiffs would have been exposed to a 9½-page discussion of various "Risk Factors," which were summarized earlier in the document as follows:

> In general, investment in the Partnership involves various and substantial risks, including the risk that the Partnership's assets may be invested in high risk investments, risks for

---

[11]   Indeed, Forex Fund II never actually engaged in the trading of foreign currencies, nor did Sam the Robot ever become engaged in a real-time trading environment for the benefit of Forex Fund II.

[12]   See Plaintiffs' Ex. 12.

[13]   *Id*. at p. 1.

certain tax-exempt investors, risks related to the limited
transferability of a Limited Partner's interest in the
Partnership, the Partnership's lack of operating history, the
Partnership's dependence upon the General Partner, and
certain tax risks.[14]

37. Had the PPM and its disclosure of significant risks been disclosed to the Plaintiffs,
they would have not invested in Forex Fund II because of those risks.

38. Had the Plaintiffs been informed that the settlement of the Forex I Litigation with
state regulators mandated the return of funds to investors, they would not have
invested in Forex Fund II because of the risk involved.

39. Had the Plaintiffs been informed that this was a start-up venture which was
looking for venture capital, and that no active trading had actually taken place,
they would not have lent to, nor invested in, Forex Fund II.

40. Without the benefit of legal or financial counsel, the Plaintiffs signed all of the
documents which Nyle Field represented to them were necessary to document the
transaction, notwithstanding the fact that they contained statements which the
Plaintiffs knew to be incorrect.

41. Specifically, Nyle Field directed the Plaintiffs to sign a receipt acknowledging that
they had received the PPM and the Addendum thereto, when, in fact, they had not
been provided a copy of that disclosure document nor otherwise informed of its
general contents.

42. The Plaintiffs trusted Nyle Field as a result of their prior dealings with him and
they signed whatever he directed them to sign as a result of that trust.

43. Based exclusively upon their trust in Nyle Field and their prior experience with
him, the Plaintiffs signed the false acknowledgment of the receipt of the PPM.[15]

44. Nyle Field was an agent of RMGT II, the general partner of Forex Fund II, when
he solicited the investment by the Plaintiffs in their Levelland home.

45. Minardi admitted at trial that Nyle Field had earlier confirmed in prior federal
court testimony that the Plaintiffs' factual accounts regarding what Nyle Field said

---

[14] *Id.* at p. 4.

[15] Plaintiffs' Ex. 10 at p. 8.

and did to induce them to make loans to Forex Fund II was substantially accurate.

46.   The Plaintiffs never met nor spoke to Minardi prior to making the loans to Forex Fund II.

47.   Based exclusively upon their trust in Nyle Field as a result of their prior experience with him, the Plaintiffs issued two checks dated December 2, 2009 and payable to Forex Fund II, each in the amount of $50,000.00.[16]

48.   In exchange for the $100,000.00 tendered by the Plaintiffs to Forex Fund II, the Plaintiffs received a single promissory note in the amount of $50,000.00 from Forex Fund II as maker, payable on or before January 10, 2011, plus interest payable on the maturity date in an amount equivalent to 18% of the principal amount of the note.[17]

49.   The single promissory note was executed on behalf of Forex Fund II by Minardi, solely in his capacity as the manager of RMGT II, the general partner of Forex Fund II.[18]

50.   The single promissory note was not executed by Minardi in his individual capacity.

51.   The Plaintiffs were entitled to receive a second $50,000 promissory note to evidence the obligation to repay the second $50,000 loan to Forex Fund II, but no such executed note was ever tendered to the Plaintiffs.

52.   The money lent by the Plaintiffs was used by Forex Fund II as bridge loans as its principals tried to obtain a major capital loan or line of credit to fund the trading venture and to meet the necessary liquidity requirements.

53.   About $75,000 of the $100,000.00 lent to Forex Fund II by the Plaintiffs was pooled with funds from other sources in an effort to acquire a line of credit from an overseas source.[19]

---

[16]   Plaintiffs' Ex. 8 & 9.

[17]   Plaintiffs' Ex. 7.

[18]   *Id.*

[19]   Plaintiffs' Ex. 18 [Testimony of Glenn Tucker at Exemplary Damage Hearing before United States District Court for the Northern District of Texas, Lubbock Division] at 47:25 - 48:6.

54. The remaining $25,000.00 lent to Forex Fund II by the Plaintiffs was utilized for general expenses, including the payment of legal expenses.[20]

55. No major capital loan or line of credit was ever obtained by Forex Fund II.

56. Forex Fund II never engaged in active trading.[21]

57. Some eleven months after tendering the $100,000 to Forex Fund II, in November 2010, the Plaintiffs were visited by representatives of the Texas State Securities Board.

58. The Texas Securities Board representatives informed the Plaintiffs that the principals of Forex Fund II were not authorized to sell the Forex Fund II securities under the agreements made, and the permanent injunction entered, in the prior Forex I Litigation, and the representatives encouraged the Plaintiffs to retain counsel to represent their legal interests in seeking a return of their funds.

59. Upon hiring counsel, the Plaintiffs made a demand upon Forex Fund II, RMGT II, and their principals for the return of the $100,000.00.   The demand was not satisfied.

60. The Plaintiffs have never received any money back from Forex Fund II, RMGT  II, or Minardi with regard to their promissory note or the additional investment.

61. On December 13, 2010, the Plaintiffs filed a complaint against Forex Fund II, Nyle Field, Raymond S. Minardi, RMGT Investments II, LLC, Glenn A. Tucker, and RSM Investments, LLC in cause no. 5:10-CV-00189-C before the United States District Court for the Northern District of Texas, Lubbock Division (the "Federal Court Litigation").

62. The complaint, as subsequently amended, sought recovery of the $100,000.00, plus interest, exemplary damages, and attorneys' fees based upon various theories of liability including alleged violations of federal securities laws, violations of the Texas Theft Liability Act, fraudulent inducement and breach of fiduciary duty.[22]

---

[20] *Id.*, Tucker testimony at 48:10-13.

[21] *Id.*, Tucker testimony at 62:1-3.

[22] Plaintiffs' Ex. 1.

63.    In the Federal Court Litigation, Minardi failed to respond timely to the Plaintiffs' request for admissions and the Northern District Court subsequently ruled that Minardi was deemed to have admitted several material facts pursuant to Fed. R. Civ. P. 36(a).

64.    The Plaintiffs filed a Motion for Summary Judgment in the Federal Court Litigation, supplemented by certain summary judgment evidence surrounding the issues in dispute.

65.    Pursuant to the conclusions of the Northern District Court, the facts which were deemed admitted pursuant to the Rule established each and every element of Plaintiffs' five claims against Minardi in the Federal Court Litigation.

66.    As a result of the deemed admissions, the Northern District Court entered an order on April 12, 2010 granting Plaintiffs' Motion for Summary Judgment in that case on claims for (1) violation of Securities and Exchange Commission Rule 10b-5, (2) breach of contract with the Plaintiffs, (3) fraudulently inducing the Plaintiffs into making investments, (4) conspiracy to commit fraud, and (5) liability under the Theft Liability Act.[23]

67.    After applying the deemed admissions and holdings from its April 12, 2010 order finding Minardi liable to the Plaintiffs for liquidated damages under the various causes of action, including violations of SEC Rule 10b-5 and common law fraud arising in connection with the purchase of a security, the Northern District Court held an evidentiary hearing regarding the imposition of exemplary damages against Minardi.

68.    With specific reference to the underlying conclusions based upon the deemed admissions, the Northern District Court entered an order on May 7, 2012 that assessed exemplary damages solely against Minardi in the amount of $200,000.[24]

69.    On May 11, 2012, the Northern District Court subsequently entered a judgment in favor of the Plaintiffs and against Minardi for compensatory damages in the amount of $100,000.00, prejudgment interest of $43,873.97, attorneys' fees in the amount of $83,598.46, and exemplary damages in the amount of $200,000.00, for

---

[23]  Defendant's Ex. U.

[24]  Defendant's Ex. K.

a total judgment amount of $427,472.43 (the "Federal Court Judgment").[25]

70.     The Plaintiffs sought post-judgment discovery in their efforts to collect on the Federal Court Judgment.  Minardi ignored or resisted such discovery.

71.     Following the entry of an order compelling Minardi to participate in the post-judgment discovery process, Minardi still failed and/or refused to do so.

72.     Upon the Plaintiffs' filing of a motion for contempt against Minardi, the Northern District Court ordered Minardi to appear at a contempt hearing.  He did not do so.

73.     On September 5, 2013, the Northern District Court found Minardi in contempt and ordered him to sit for a post-judgment deposition, and to fulfill corresponding document production requests, and assessed against him an attorneys' fees award in favor of the Plaintiffs in the amount of $2,940.00 (the "Sanctions Order").[26]

74.     Before other collection efforts could commence, Minardi and his spouse, Debbie Ann Minardi, filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code in this Court on November 16, 2013.

75.     The Plaintiffs' claim was scheduled as an unsecured claim in Minardi's Chapter 7 bankruptcy case.[27]

76.     On December 23, 2013, the Plaintiffs filed a proof of claim in Minardi's Chapter 7 case, asserting a general unsecured claim in the amount of $430,810.74 based upon the Federal Court Judgment and the post-judgment contempt award entered in the Federal Court Litigation.[28]

77.     On January 29, 2014, the Plaintiffs filed their original complaint in this adversary proceeding, seeking a determination that the debt owed to them is

---

[25]  See Exhibit C to Plaintiffs' Original Complaint.  Though obviously contesting the propriety of the Federal Court Judgment, the Defendant admitted in his original answer that the judgment, and its various components, was entered on May 11, 2012 by the Northern District Court in the Federal Court Litigation.  See dkt #4.

[26]  Plaintiffs' Ex. 5.

[27]  Schedule F filed by the Debtors on November 16, 2013 [dkt #1] in case no. 13-42770.

[28]  Plaintiffs' Claim 1-1 filed on December 23, 2013 in the claims registry of case no. 13-42770.

nondischargeable under 11 U.S.C. §523(a)(2)(A), (a)(4), or (a)(19).[29]

78. On June 27, 2014, the Plaintiffs filed a first amended motion for summary judgment, asking this Court to apply the general principles of issue preclusion to find the judgment debt owed by Minardi nondischargeable under §523(a)(2)(A).

79. On October 14, 2014, applying the general principles of issue preclusion applicable to a federal court judgment,[30] this Court denied the entry of summary judgment for the Plaintiffs under the general principles of issue preclusion.

80. The Plaintiffs' summary judgment motion was denied because the assessment of liability against Minardi in the Federal Court Litigation was based upon certain facts deemed admitted under Fed. R. Civ. P. 36 and general issue preclusion principles cannot be properly applied in subsequent litigation for matters deemed admitted under that procedural rule since deemed admissions have not been "actually litigated." *In re Cassidy*, 892 F.2d 637, 640 n.1 (7th Cir. 1990); *Hernandez v. Pizante (In re Pizante)*, 186 B.R. 484, 489 (B.A.P. 9th Cir. 1995); *Cozzone v. Ingui*, 2006 WL 3069465 (E.D. Pa., Oct. 25, 2006).

81. The Plaintiffs have failed to demonstrate by a preponderance of the evidence that Minardi made representations to induce them to make the loans/investments to Forex Fund II that were knowingly false at the time they were made or that were made for the purpose of deceiving the Plaintiffs.

82. The Plaintiffs have failed to demonstrate by a preponderance of the evidence that Minardi had actual knowledge that they had been induced to make their initial loans/investments to Forex Fund II through the false representations of Nyle Field.

83. The Plaintiffs have failed to demonstrate by a preponderance of the evidence that Minardi otherwise participated in or assented to the false representations which Nyle Field utilized to induce the Plaintiffs to make their initial loans/investments

---

[29] The complaint was also filed by the Plaintiffs against the joint debtor, Debbie Ann Minardi, but the Court granted a motion to dismiss all §523 actions against Ms. Minardi on March 7, 2014 pursuant to Fed. R. Bankr. P. 7012.  See dkt #7.

[30] Because the judgment against Minardi arose from a federal court, federal principles of issue preclusion control.  *Rabo Agrifinance, Inc. v. Terra XXI, Ltd.*  583 F.3d 348, 353 (5th Cir. 2009). Accordingly, the application of issue preclusion in this case rests upon three factors: (1) the issue at stake must be identical to the one involved in the prior action; (2) the issue must have been actually litigated in the prior action; and (3) the determination of the issue in the prior action must have been a critical and necessary part of the judgment in that earlier action.  *Id.*

to Forex Fund II.

84.     Notwithstanding the possibility that Minardi may have intentionally conveyed false information to other investors/limited partners of Forex Fund II, he never made representations of any kind to the Plaintiffs to induce them to make the loan/investments.

85.     Though there may have been intentionally false statements contained in the PPM, the Plaintiffs did not possess nor review the contents of the PPM prior to making their decision to lend to, or invest in, Forex Fund II.

86.     Though there may have been intentionally false statements contained in the PPM, the Plaintiffs did not rely upon, indeed could not have relied upon, any of those statements as an inducement to lend to, or invest in, Forex Fund II.

87.     The Plaintiffs have failed to demonstrate by a preponderance of the evidence that they actually relied upon any false representation made by Minardi.

88.     The Plaintiffs instead were induced to lend money to, or to make an investment in, Forex Fund II solely by the false representations of Nyle Field.

89.     The Plaintiffs have failed to establish by a preponderance of the evidence that Minardi made false representations to them at the time of their loan/investment in Forex Fund II with the intention and purpose of deceiving them.

90.     The Plaintiffs have failed to establish by a preponderance of the evidence that Minardi personally engaged in conduct that resulted in the unlawful appropriation of their property.

91.     The Plaintiffs have failed to establish by a preponderance of the evidence that Minardi personally engaged in conduct with an intent to deprive the Plaintiffs of their property in an unlawful manner.

92.     The Plaintiffs have failed to establish by a preponderance of the evidence that Minardi personally engaged in conduct for which he could be convicted of theft under the Texas Penal Code with regard to the Plaintiffs' property.

93.     The Plaintiffs have failed to establish by a preponderance of the evidence that Minardi committed larceny arising from the Plaintiffs' decision to lend and/or to invest funds in Forex Fund II.

94.     To the extent any of these findings of fact constitute conclusions of law, the Court expressly adopts them as such.

## CONCLUSIONS OF LAW

*Jurisdiction and Allocation of Judicial Power*

1.      This Court has subject matter jurisdiction under 28 U.S.C. §§1334 and 11 U.S.C. §523.  This Court has personal jurisdiction over the parties to this adversary proceeding.

2.      This Court has authority to enter a final judgment in this adversary proceeding since it statutorily constitutes a core proceeding as contemplated by 28 U.S.C. §157(b)(2)(I) and (O) and meets all constitutional standards for the proper exercise of full judicial power by this Court.

3.      The complaint filed by the Plaintiffs seeks a determination that the debt which they allege is owed to each of them by Minardi should be excepted from discharge under 11 U.S.C. §523(a)(2)(A), §523(a)(4), and/or §523(a)(19).

4.      In seeking to except the debts owing to them from the scope of the discharge granted to Minardi, the Plaintiffs assume the burden of proof under a preponderance of the evidence standard.  *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

5.      All exceptions to discharge under §523 "must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start."[31]  *Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997).[32]

---

[31]  However, a fresh start is not promised to all who file for bankruptcy relief, but only to "the honest but unfortunate debtor."  *Grogan*, 498 U.S. at 286-87.

[32]  The Fifth Circuit has noted that there are limits to the maxim that exceptions to dischargeability are to be construed narrowly in favor of the debtor, particularly in situations falling under an exception to dischargeability in a case in which a debtor has committed fraud. *See generally Deodati v. M.M. Winkler & Associates (In the Matter of: M.M. Winkler & Associates),* 239 F.3d 746, 751 (5th Cir. 2001).

*Texas Theft Liability Act*

6.  Under the Texas Theft Liability Act ("TTLA"), "a person who commits theft is liable [civilly] for the damages resulting from the theft." 6 TEX. PRAC. & REM. CODE §134.003(a) (Vernon 2011). *See generally*, *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348, 366 (Tex. App.–Dallas 2009, pet. denied).

7.  Theft is defined as "unlawfully appropriating property or unlawfully obtaining services as described by sections 31.03–31.07, or 31.11–31.14 of the Texas Penal Code." 6 TEX. PRAC. & REM. CODE §134.002(a) (Vernon 2011).

8.  Section 31.03(a) of the Texas Penal Code provides that a person "commits an offense if he unlawfully appropriates[33] property with intent to deprive[34] the owner of property." 4 TEX. PENAL CODE §31.03(a) (Vernon Supp. 2014).

9.  The element of intent for these purposes can be inferred from the surrounding circumstances. *Powers v. Caremark, Inc. (In re Powers)*, 261 Fed. App'x. 719, 722 (5th Cir. 2008).

10. However, the intent to deprive must exist at the time of the taking. *Id.*; *Countrywide Home Loans, Inc. v. Cowin (In re Cowin)*, 492 B.R. 858, 896 (Bankr. S.D. Tex. 2013).

11. "Appropriation of property is unlawful if it is without the owner's effective consent." 4 TEX. PENAL CODE §31.03(b)(1) (Vernon Supp. 2014).

12. To recover in this context for a civil theft under the TTLA, a plaintiff must establish: (1) the plaintiff had a possessory right to property; (2) the defendant unlawfully appropriated property in violation of the theft provisions of the Texas Penal Code; and (3) the plaintiff sustained damages as a result of the theft. *Wellogix, Inc. v. Accenture, LLP*, 788 F.Supp.2d 523, 542 (S.D. Tex. 2011).

---

[33] A person "appropriates" property when he "bring[s] about a transfer or purported transfer of title or other non-possessory interest in property, whether to the actor or another, or acquire[s] or otherwise exercise control over property other than real property. 4 TEX. PENAL CODE §31.01(4) (Vernon Supp. 2012).

[34] To "deprive" another of property includes any action "to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner" or "to dispose of property in a manner that makes recovery of the property by the owner unlikely." 4 TEX. PENAL CODE §31.01(2)(A) and (C) (Vernon Supp. 2012).

13.  Notwithstanding the fact the TTLA incorporates the definition of a theft from the Texas Penal Code, a plaintiff seeking recovery under the statute must prove the elements only by a preponderance of the evidence.  *Powers*, 261 Fed. App'x. at 721.

14.  A person who has sustained damages resulting from theft may recover actual damages, additional statutory damages of up to $1,000, court costs and reasonable attorney's fees under this civil liability statute.  6 TEX. PRAC. & REM. CODE §134.005 (Vernon 2011); *TXCO Resources, Inc. v. Peregrine Petroleum, LLC (In re TXCO Resources, Inc.)* 475 B.R. 781, 834 (Bankr. W.D. Tex. 2012).

15.  The award of $1,000.00 statutory damages is contingent upon an award of actual damages.  *Jones v. Texas Dept. of Criminal Justice*,  2009 WL 2645028, at *2 (Tex. App.– Corpus Christi 2009, no pet.).  "Actual damages," within the meaning of the Act, are those recoverable at common law.  *Beaumont v. Basham,*  205 S.W.3d 608, 619 (Tex. App.– Waco 2006, pet. denied).

16.  As an unlawful appropriation of funds for personal use with a fraudulent intent, a civil theft under the TTLA will satisfy the requirements for larceny so as to render a debt nondischargeable under 11 U.S.C. §523(a)(4).  *S & S Food Corp. v. Sherali (In re Sherali),* 490 B.R. 104, 124 (Bankr. N.D. Tex. 2013) )

*Nondischargeability Under 523(a)(2)(A):  Debt Arising by Fraud, False Pretenses, or False Representation*.

17.  The Plaintiffs' Complaint seeks a determination that the debt owed to each of them should be excepted from discharge under §523(a)(2)(A) as a debt obtained by false pretenses, a false representation or actual fraud.

18.  11 U.S.C. §523(a)(2)(A) of the Bankruptcy Code provides that:

> a discharge under §727 of this title does not discharge an individual debtor from any debt for money, property, or services, ... to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

19.  Section 523(a)(2)(A) encompasses similar but distinct causes of action.  Though

other circuits have applied a uniform standard to all § 523(a)(2)(A) actions,[35] the Fifth Circuit has distinguished the elements of "actual fraud" and of "false pretenses and false representations."  *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1291 (5th Cir. 1995).

20.  The distinction recognized by the Fifth Circuit appears to be a chronological one, resting upon whether a debtor's representation is made with reference to a future event, as opposed to a representation regarding a past or existing fact. *Bank of La. v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir.1991) [A debtor's promise ... related to a future action which does not purport to depict current or past fact ... therefore cannot be defined as a false representation or a false pretense].

21.  All substantive aspects of § 523(a)(2)(A) are triggered by this complaint.

22.  A debt may be declared non-dischargeable if it was obtained by false pretenses or by a false representation.  While "false pretenses" and "false representation" both involve intentional conduct intended to create and foster a false impression, the distinction is that a false representation involves an express statement, while a claim of false pretenses may be premised on misleading conduct without an explicit statement. *See FNFS, Ltd. v. Harwood (In re Harwood),* 404 B.R. 366, 389 (Bankr. E.D. Tex. 2007); *Wallace v. Davis (In re Davis)*, 377 B.R. 827, 834 (Bankr. E.D. Tex. 2007).

23.  In order for a debtor's representation to constitute a false pretense or a false representation, it "must have been: (1) [a] knowing and fraudulent falsehood, (2) describing past or current facts, (3) that [was] relied upon by the other party."[36]

---

[35]  *See, e.g., Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir. 1991); *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir. 1987).  Though some bankruptcy courts outside of the Fifth Circuit have cited the decision of the United States Supreme Court in *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351(1995), in support of their proposition that all of the §523(a)(2)(A) actions are governed by the elements for actual fraud, *see, e.g., AT&T Universal Card Services v. Ellingsworth (In re Ellingsworth)*, 212 B.R. 326 (Bankr. W.D. Mo. 1997); *AT& T Universal Card Services v. Alvi (In re Alvi)*, 191 B.R. 724 (Bankr. N.D. Ill. 1996); the Supreme Court in that case was actually distinguishing the language used in §523(a)(2)(A) from that utilized in §523(a)(2)(B) in order to determine the degree of reliance necessary above mere reliance in fact in order to exempt a debt from discharge under (a)(2)(A).  Since the Supreme Court specifically refused to even apply their direct holding regarding the degree of  reliance in actual fraud cases to cases of false pretense or false representation, 116 S.Ct. at 443, n. 8, the statement that the Court erased all distinctions between the three (a)(2)(A) actions strains credibility.

[36]  Though the Supreme Court in *Field v. Mans* avoided a determination of the degree of reliance required in a false pretense or false representation case, it is reasonable to assume that justifiable reliance,

*RecoverEdge L.P.* at 1292-93; *Allison v. Roberts (In re Allison)*, 960 F.2d 481, 483 (5th Cir. 1992); *see also In re Bercier*, 934 F.2d at 692 ["to be a false representation or false pretense under § 523(a)(2), the false representations and false pretenses must encompass statements that falsely purport to depict current or past facts"].

24.    The degree of reliance otherwise required under §523(a)(2)(A) of the Bankruptcy Code is justifiable reliance. *Field v. Mans*, 516 U.S. 59, 70-71 (1995).

25.    "Justifiable reliance requires proof that a plaintiff *actually relied* upon the defendant's false representations and that such reliance was justified under the circumstances." *First Horizon Home Loan Corp. v. Apostle (In re Apostle)*, 467 B.R. 433, 443 (Bankr. W.D. Mich. 2012) (emphasis in original).

26.    "Justifiable reliance is a less demanding standard than reasonable reliance." *First American Title Ins. Co. v. Lett (In re Lett)*, 238 B.R. 167, 186 (Bankr. W.D. Mo. 1999).

27.    Justifiable reliance does not require a plaintiff to demonstrate reasonableness nor does it impose a duty to investigate unless the falsity is readily apparent.

28.    "Whether a party justifiably relies on a misrepresentation is determined by looking at the circumstances of a particular case and the characteristics of a particular plaintiff, not by an objective standard." *Guion v Sims (In re Sims)*, 479 B.R. 415, 425 (Bankr. S.D. Tex. 2012) (citing *Field v. Mans*, 516 U.S. at 71).

29.    It incorporates "the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct in all cases." *Field*, 516 U.S. at 70-71.

30.    "The justifiable reliance standard imposes no duty to investigate unless the falsity of the representation is readily apparent or obvious or there are 'red flags' indicating such reliance is unwarranted." *Manheim Automotive Financial Svcs., Inc. v. Hurst (In re Hurst)*, 337 B.R. 125, 133-34 (Bankr. N.D. Tex. 2005).

31.    Because Minardi did not make any representations to the Plaintiffs upon which the Plaintiffs could have relied to their detriment prior to the tendering of their

---

in addition to reliance in fact, is the correct level of reliance required to sustain a finding of nondischargeability in a false pretense or false representation case. *In re Hernandez*, 208 B.R. 872, 876 n.4 (Bankr. W.D. Tex. 1997).

property, any debt otherwise owed by Minardi to the Plaintiffs cannot be properly characterized as one obtained through a false representation or a false pretense for the purposes of §523(a)(2)(A).

32.   To have a debt excepted from discharge pursuant to the "actual fraud" provision in § 523(a)(2)(A), an objecting creditor must prove that:

> (1) the debtor made representations;
> (2) at the time they were made the debtor knew they were false;
> (3) the debtor made the representations with the intention and purpose to deceive the creditor;
> (4) the creditor justifiably relied on such representation; and
> (5) the creditor sustained losses as a proximate result of the representations.
> *Pentecost*, 44 F.3d at 1293, *as modified by the United States Supreme Court decision of Field v. Mans*, 516 U.S. 59 (1995) [regarding the proper standard of reliance].

33.   It is widely recognized that "[a] promise to perform acts in the future is not a qualifying misrepresentation merely because the promise subsequently is breached." *Woo, Inc. v. Donelson (In re Donelson)*, 410 B.R. 495, 503 (Bankr. S.D. Tex. 2009) (citing *Allison,* 960 F.2d at 484).

34.   A breach of contract "is not sufficient to make a debt non-dischargeable, even though there is no excuse for the subsequent breach." *Turbo Aleae Inv., Inc. v. Borschow (In re Borschow)*, 454 B.R. 374, 395 (Bankr. W.D. Tex. 2011) (citing *Bercier*, 934 F.2d at 692), *aff'd,* 467 B.R. 410 (W.D. Tex. 2012).

35.   Further, fraudulent conduct occurring subsequent to the time that an indebtedness is created is generally irrelevant to the issue of whether the debt was "obtained by false pretenses, a false representation, or actual fraud" within the meaning of §523(a)(2)(A) of the Bankruptcy Code.  *Borschow*, 454 B.R. at 401; *ColeMichael Investments, LLC v. Burke (In re Burke)*, 405 B.R. 626, 648 (Bankr. N.D. Ill. 2009) *aff'd,* 436 B.R. 53 (N.D. Ill. 2010); *Batcha v. Forness (In re Forness)*, 334 B.R. 724, 734 (Bankr. M.D. Fla. 2005).

36.   Because Minardi did not otherwise make any representations to the Plaintiffs upon which the Plaintiffs could have relied to their detriment prior to the tendering of their property, any debt otherwise owed by Minardi to the Plaintiffs cannot be properly characterized as one obtained through actual fraud for the purposes of §523(a)(2)(A).

37.　However, the imputation of fraud for §523(a) nondischargeability purposes is possible under appropriate circumstances, notwithstanding the fact that a debtor-defendant may not have consented to the fraudulent acts, nor even had any knowledge or involvement in the fraud.  See, e.g. *Luce v. First Equip. Leasing Corp. (In re Luce)*, 960 F.2d 1277, 1282 (5th Cir. 1992) [referencing *Strang v. Bradner*, 114 U.S. 555, 561 (1885)].

38.　"The test under section 523(a)(2)(A), however, is not whether the debtor actually procured the money, property, services or credit for him or herself.  Rather, the Code dictates that a particular debt is nondischargeable *if the debtor benefits in some way* from the money, property, services or credit obtained through deception."  *Luce,* 960 F.2d at 1283 (emphasis added; citations and internal quotations omitted).

39.　As the Fifth Circuit stated in *Tummel & Carroll v. Quinlivan (In re Quinlivan)* 434 F.3d 314, 318 (5th Cir. 2005):

> Section 523(a)(2)(A) is not designed to protect debtors; rather it is designed to protect the victims of fraud.  Holding the debtor accountable for his partner's [or agent's] fraud effectuates important state law policies regarding imputed liability.  These state law policies create incentives for the debtor to control or monitor the conduct of his agent or partner.  Even if the partner [or principal] is innocent of wrongdoing and had no knowledge or reason to know of the fraud, the debt is not dischargeable under §523(a)(2)(A).

434 F.3d at 319.

40.　"This circuit imputes fraud to debtors only if the fraudulent representations were made by a formal partner or agent.  The relationship between the parties is analyzed under state law."  *Id.*

41.　As a Delaware limited liability company, the liability of RMGT II for the acts of its corporate agents is determined by Delaware law.

42.　Such imputation of liability can occur in the context of a limited liability company under Delaware law.  *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *11 (Del. Ch., Aug. 26, 2005).

43. For a principal to be held vicariously liable for the acts of an agent, . . . Delaware law does require that a tort be committed by the servant within the scope of his employment and not [be] unexpectable in view of the duties of the servant." *Vichi v. Koninklijke Philips Electronics, N.V.*, 85 A.3d 725, 778 (Del. Ch. 2014) (internal quotations omitted).

44. If those requirements are met, a corporate entity is "accountable for any acts committed by one of its agents within his actual or apparent scope of authority and while transacting corporate business." *JNA-1 Corp. v. Uni-Marts, LLC (In re UniMarts, LLC)*, 404 B.R. 767, 784 (Bankr. D. Del. 2009); *see also, Miller v. McCown De Leeuw & Co., Inc., (In re The Brown Schools)*, 386 B.R. 37, 55 (Bankr. D. Del. 2008) ["A court will impute the fraud of an officer or agent to the corporation where the officer or agent commits the allegedly fraudulent act in the course of his employment for the benefit of the corporation."].

45. Thus, the fraud perpetrated upon the Plaintiffs by Nyle Field, as an agent acting within the course and scope of his employment with RMGT, II, could properly be imputed upon RMGT II.

46. As a manager of a Delaware limited liability company, the liability of Minardi for the debts or liabilities of RMGT II is determined by Delaware law.

47. Delaware law provides that:

> Except as otherwise provided by this chapter, the debts, obligations and liabilities of a limited liability company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the limited liability company, and no member or manager of a limited liability company shall be obligated personally for any such debt, obligation or liability of the limited liability company solely by reason of being a member or acting as a manager of the limited liability company.

DEL. CODE ANN., tit. 6, §18-303 (Westlaw 2015).

48. The fraud perpetrated upon the Plaintiffs by Nyle Field, as an agent acting within the course and scope of his employment with RMGT, II, cannot be properly imputed upon Minardi in his individual capacity or as a result of his capacity as the manager of RMGT II.

49. Because the Court concludes that the Plaintiffs have failed to prove by a preponderance of the evidence that their alleged claim amount was obtained by false representations, false pretenses, or actual fraud by Raymond S. Minardi, or that liability for any fraud perpetrated upon the Plaintiffs can be properly imputed to Minardi under Delaware law, judgment must be rendered for Minardi on this §523(a)(2)(A) claim.

*Nondischargeability Under §523(a)(4):*
*Debt Arising from  Larceny.*

50. Larceny is the wrongful taking and carrying away of the property of another with intent to convert such property to the taker's own use *without* the consent of the owner.  *See generally, Sherali* , 490 B.R. at 124; *McDaniel v. Border (In re McDaniel),* 181 B.R. 883, 887 (Bankr. S.D. Tex. 1994).

51. "Both larceny and embezzlement involve the fraudulent appropriation of property; they differ only in timing.  Larceny applies when a debtor unlawfully appropriates property at the outset, whereas embezzlement applies when a debtor unlawfully appropriates property after it has been entrusted to the Debtor's care."  *Rainey v. Davenport (In re Davenport),* 353 B.R. 150, 199 (Bankr. S.D. Tex. 2006).

52. As an unlawful appropriation of funds for personal use with a fraudulent intent, a civil theft under the Texas Theft Liability Act will satisfy the requirements for larceny so as to render a debt nondischargeable under 11 U.S.C. §523(a)(4). *Sherali,* 490 B.R. at 124; *Drexel Highlander, L.P. v. Edelman (In re Edelman)*, 2014 WL 1796217, at *42 (Bankr. N.D. Tex., May 6, 2014).

53. Because the Court concludes that the Plaintiffs have failed to prove by a preponderance of the evidence that their alleged claim amount was obtained by a larceny committed by Raymond S. Minardi, judgment must be rendered for the Defendant on this §523(a)(4) claim.

*Nondischargeability Under §523(a)(19):*
*Debt Arising from Securities Violation or Related Fraud*
*and Expansion of General Issue Preclusion Principles.*

54. The Plaintiffs' Complaint seeks a determination that the debt owed to each of them should be excepted from discharge under §523(a)(19) as a debt arising from a violation of securities law.

55.     11 U.S.C. §523(a)(19)of the Bankruptcy Code provides that:

a discharge under §727 of this title does not discharge an individual debtor from any debt that:

(A) is for —

(i) the violation of any of the Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1947),[37] any of the State securities laws, or any regulation or order issued under such Federal or State securities laws; or

(ii) common law fraud, deceit, or manipulation in connection with the purchase or sale of any security; and

(B) results, before, on, or after the date on which the petition was filed, from —

(i) any judgment, order, consent order, or decree entered in any Federal or State judicial or administrative proceeding;

(ii) any settlement agreement entered into by the debtor; or

(iii) any court or administrative order for any damages, fine, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor.

56.     This nondischargeability section was added to the Bankruptcy Code in wake of the Enron "debacle" by the Sarbanes-Oxley Act of 2002 in order "to make judgments and settlements based upon securities law violations nondischargeable, protecting victims' ability to recover their losses."  *In re Chan*, 355 B.R. 494, 503 (Bankr. E.D. Pa. 2006).

57.     The subsection was also intended to preclude the necessity of securities regulators and investors to spend precious enforcement resources to "reprove" securities law

---

[37]   That section defines "securities laws" to mean the Securities Act of 1933, the Securities Exchange Act of 1934, the Public Utility Holding Company Act of 1935, the Trust Indenture Act of 1939, the Investment Company Act of 1940, the Investment Advisers Act of 1940, and the Securities Investor Protection Act of 1970.

**Page 23 of  26**

violations in the bankruptcy court in order to protect securities-related judgments and settlements from discharge.  See S. REP. NO. 107-146, at 16 (2002) [recognizing that the "loophole" which allowed a discharge in bankruptcy "should be closed to help defrauded investors recoup their losses and to hold accountable those who violate securities laws after a government unit or private suit results in a judgement or settlement against the wrongdoer."].

58.   Section 523(a)(19) was subsequently modified upon the adoption of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") by expanding the timeframe under which the judgment, settlement, order or decree documenting a securities violation or related fraud could be entered.  *Tripodi v. Capital Concepts, LLC*, 2014 WL 2967941 at *8 (D. Utah, July 1, 2014)

59.   Debts are rendered nondischargeable under § 523(a)(19) not only from statutory securities violations, but also those arising from common law fraud occurring in securities transactions.  *Frost v. Civiello (In re Civiello)*, 348 B.R. 459, 464 (Bankr. N.D. Ohio 2006).

60.   To have a debt excepted from discharge pursuant to § 523(a)(19), an objecting creditor must prove that:

>    (1) the debt is for violation of federal or state securities laws or for common law fraud in connection with the sale of a security; and

>    (2) the debt must be memorialized in a judicial or administrative order, or in a settlement agreement.

*McGraw v. Collier (In re Collier)*, 497 B.R. 877, 902 (Bankr. E.D. Ark. 2013); *Faris v. Jafari (In re Jafari)*, 401 B.R. 494, 496 (Bankr. D. Colo. 2009).

61.   The proper interpretation of § 523(a)(19), even as amended, requires that a tribunal other than the bankruptcy court determine the liability aspect — e.g., whether a federal or state securities violation or some type of related fraud has occurred. *Collier,* 497 B.R. at 902-03; *Terek v. Bundy (In re Bundy)*, 468 B.R. 916 (Bankr. E.D. Wash. 2012).

62.   However, once a determination of a securities violation or related fraud has been made, and proof of the entry of that order or the existence of a settlement of such charges is tendered to the bankruptcy court, the debt is rendered nondischargeable under § 523(a)(19) without proof of any additional element.

63.  In other words, § 523(a)(19) "provides for an underlying determination of liability that, in itself, serves as the basis for rendering a debt nondischargeable." *Voss v. Pujdak (In re Pujdak)*, 462 B.R. 560, 576 (Bankr. D.S.C. 2011) [giving preclusive effect under § 523(a)(19) to a default judgment after the state court struck the defendants' answer due to discovery abuse].

64.  This unusual approach to the dischargeability of a particular debt as triggered by § 523(a)(19), and which is also utilized by similar statutes such as § 523(a)(11),[38] preempts and effectively extends the common law principles of issue preclusion, by giving preclusive effect to memorialized judicial decisions or settlements which have not been "actually litigated."

65.  Thus, in contrast to "normal" issue preclusion principles,[39] the fact that the liability determinations leading to the entry of the Federal Court Judgment against Minardi were primarily based upon deemed admissions does not insulate that judgment from a determination of nondischargeability under § 523(a)(19).  Indeed, that is precisely how § 523(a)(19) is designed to work.

66.  The satisfaction of the two requirements of  § 523(a)(19) by the Plaintiffs now precludes Minardi at this stage from offering a defense to the claims of a Rule 10b-5 violation, fraudulent inducement, or civil conspiracy to commit fraud, notwithstanding the fact that such issues were not actually litigated in the Federal Court Litigation.  *Pujdak,* 462 B.R. at 579.

67.  Because the indebtedness owed to the Plaintiffs by Minardi is based upon the violation of federal securities laws and common law fraud in connection with the purchase of a security, and because the indebtedness has been previously memorialized through the entry of a judgment in a federal judicial proceeding, the Federal Court Judgment is rendered nondischargeable pursuant to 11 U.S.C. § 523(a)(19).

68.  The Sanctions Order entered against Minardi on September 5, 2013 by the Northern District Court as a result of Minardi's failure to participate in post-judgment discovery does not fall within the scope of § 523(a)(19).  Thus, the attorneys' fees award of $2,940.00 cannot be rendered nondischargeable under that subsection.

---

[38]  *See, e.g., Meyer v. Rigdon*, 36 F.3d 1375, 1379 (7th Cir. 1994) [observing, in finding a default judgment had preclusive effect under §523(a)(11), "because collateral estoppel is a common law creature, it can, of course, be pre-empted by Congressional action."].

[39]  *See supra,* note 30.

69.   Court costs of $293.00 incurred in this adversary proceeding are assessed against Minardi and in favor of the Plaintiffs.


## CONCLUSION

70.   Thus, the outstanding indebtedness owed by the Defendant, Raymond S. Minardi, to the Plaintiffs, Mack and Alice Wright, comprised of liquidated compensatory damages of $100,000.00, pre-judgment interest of $43,873.97, attorney's fees in the amount of $83,598.46, and exemplary damages in the amount of $200,000.00, for a total judgment amount of $427,472.43, all as established by the Federal Court Judgment, plus all applicable post-judgment interest on the judgment amount, plus the $293.00 in court costs awarded to the Plaintiffs and assessed against Minardi in this adversary proceeding, is therefore excepted from discharge pursuant to 11 U.S.C. §523(a)(19).

71.   All other relief requested in the Plaintiffs' Complaint in the above-referenced adversary proceeding shall be denied.

72.   To the extent any of these conclusions of law constitute findings of fact, the Court expressly adopts them as such.

73.   An appropriate judgment shall be entered consistent with these findings and conclusions.


Signed on 08/27/2015


_____
THE HONORABLE BILL PARKER
UNITED STATES BANKRUPTCY JUDGE